UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SABRINA BRISCOE,                                    :

               Plaintiff,                    :          11 Civ. 3509 (GWG)

    -v.-                                             :          OPINION AND ORDER

MICHAEL J. ASTRUE, Commissioner of        :
Social Security,
                                 :
               Defendant.
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

     Plaintiff Sabrina Briscoe brings this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of the final decision of the Commissioner of Social Security denying her claim

for disability insurance benefits under the Social Security Act.  The parties consented to this

matter being decided by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  The

Commissioner and Briscoe have moved separately for judgment on the pleadings pursuant to

Fed. R. Civ. P. 12(c).  For the reasons stated below, the Commissioner's motion is denied and

Briscoe's motion is granted in part.  The case is remanded for further proceedings.

I.     BACKGROUND

     A.    Administrative Proceedings

     Briscoe applied for social security disability and social security insurance benefits on

September 25, 2008, see Administrative Record (annexed to Notice of Filing of Administrative

Record, filed Sept. 20, 2011 (Docket # 8)) ("R.") 28, alleging that she became disabled on July

6, 2008, id.  Briscoe is insured for disability benefits through December 31, 2013.  Id.  Briscoe

was most recently employed as a paint salesperson at Home Depot and had previously worked

both as a receptionist at H&R Block and as a cleaning porter at Madison Square Garden.  R.

49–51.

Following a hearing before an Administrative Law Judge ("ALJ"), Briscoe's application was denied on April 9, 2010.  See R. 28–39.  Briscoe appealed the ALJ's ruling.  See R. 21–23. On March 29, 2011, the Appeals Council denied Briscoe's request for review.  See R. 1–4.

        B.      Procedural History

On May 23, 2011, Briscoe filed the instant action seeking review of the ALJ's decision. See Complaint, filed May 23, 2011 (Docket # 11).  On October 21, 2011, the Commissioner moved for judgment on the pleadings.  See Notice of Motion, filed Oct. 21, 2011 (Docket # 9); Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, filed Oct. 21, 2011 (Docket # 10).  Briscoe responded with a cross-motion for judgment on the pleadings.  See Motion for Judgment on the Pleadings, filed Nov. 21, 2011 (Docket # 12); Plaintiff's Memorandum of Law in Support of Her Motion for Judgment on the Pleadings, filed Nov. 21, 2011 (Docket # 13) ("Pl. Mem.").  The Commissioner submitted a reply and opposition to the plaintiff's motion.  See Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Further Support of the Commissioner's Motion for Judgment on the Pleadings, filed Dec. 19, 2011 (Docket # 16) ("Reply").

        C.      The Administrative Record

            1.      Medical Records

                a.      Background

Briscoe was born on July 27, 1964.  R. 246.  Briscoe broke her femur and ankle in 1992 after being pushed out of a fifth-floor window.  R. 307–08, 310, 312–14, 492, 603.  The fracture was surgically repaired.  R. 603.

b.      Federation Employment Guidance Service

On May 30, 2008, Briscoe was evaluated at the Federation Employment Guidance Service ("F.E.G.S.") by Charlene Jackson, a social worker.  See R. 300–21.  Briscoe reported to Jackson that she felt depressed.  R. 307.  Briscoe appeared "cooperative, friendly, and well groomed" to Jackson.  Id.  Briscoe did not evidence any suicidal behavior.  R. 306.  Briscoe indicated that she is able to perform various household chores independently, including cooking and making beds, see id., and denied having difficulty concentrating or having had a loss of energy or appetite within the preceding two weeks, see R. 305.  Briscoe reported that she had experienced difficulty sleeping and "[l]ittle interest or pleasure in doing things" on several days during the preceding two weeks.  See R. 305.  Jackson attributed a "PHQ-9"[1] score to Briscoe of 2, R. 306, indicating "[n]ormal or minimal depressive symptoms," R. 320.

Dr. Michael Ward also examined Briscoe at F.E.G.S.  See R. 309–21.  Dr. Ward reported normal examination findings except for elevated blood pressure and EKG results suggestive of septal infarct.  See R. 309–13.  Dr. Ward referred Briscoe to the emergency room, but she declined to go.  R. 313.  Dr. Ward also noted that Briscoe had a depressed mood and pain in her left ankle and lower extremity.  R. 309–13.

On June 4, 2008, Dr. Jorge Kirschtein, a psychiatrist, evaluated Briscoe at F.E.G.S.  See R. 322–28.  Dr. Kirschtein indicated that Briscoe reported feeling depressed and helpless, being socially isolated, and having poor concentration, low energy, and disturbed sleep.  R. 324.  Briscoe denied suicidal ideation, manic episodes, hallucinations, and delusions.  Id.  Briscoe

---

[1] The PHQ-9, or "Personal Health Questionnaire," is a "self-administered . . . depression module" which serves as a measure of "depression severity." Kurt Kroenke et al., The PHQ-9: Validity of a Brief Depression Severity Measure, 16 J. Gen. Internal Med. 606 (2001).

reported panic attacks relating to being pushed out of a window.  Id.  Dr. Kirschtein observed

that Briscoe had logical thought, normal thought content and speech, and intact attention,

orientation, and cognition. R. 324–25.  Dr. Kirschtein described Briscoe as being cooperative,

restless, and neat in appearance during the examination. R. 324.  Dr. Kirschtein determined that

Briscoe had "moderate" functional impairments in the categories of ability to follow work rules,

accept supervision, deal with the public, maintain attention, relate to co-workers, and adapt to

change. R. 326.  He determined that Briscoe had a "severe" functional impairment in the

categories of ability to adapt to stressful situations.  Id.   He made a further note that Briscoe had

a "severe impairment in persistence."  Id.  Dr. Kirschtein assessed Briscoe as having a global

assessment of functioning ("GAF")[2] score of 50, id., which indicates serious symptoms or any

serious impairment in social, occupational, or school functioning.  DSM at 34.  Dr. Kirschtein

diagnosed Briscoe as having untreated posttraumatic stress disorder ("PTSD") "with generalized

anxiety" and dysthymic disorder.[3]  R. 326–27.

### c.   Harlem Hospital Center

On June 1, 2008, Briscoe entered the Harlem Hospital Center with reports of chest pains.

See R. 581–92.  Briscoe reported that she had seen a "welfare doctor" the preceding week who

told her that an electrocardiogram ("EKG") indicated that she had sustained a heart attack.  R.

---

[2] The GAF scale reports an individual's "psychological, social, and occupational functioning" and is "particularly useful in tracking the clinical progress of individuals in global terms, using a single measure."  Diagnostic and Statistical Manual of Mental Disorders ("DSM") 32 (4th ed., text revision 2000).

[3] Dysthmyc Disorder is defined as "a chronically depressed mood that occurs for most of the day more days than not for at least 2 years" with "symptom-free intervals last[ing] no longer than 2 months," accompanied by at least two additional symptoms including "poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration or difficulty making decisions, and feelings of hopelessness."  DSM at 377.

582.  She stated that the "welfare doctor" advised her to go to Bronx Lebanon Hospital to have

another EKG performed.  R. 582.  Briscoe went to Harlem Hospital instead and was examined

by Dr. Aneliese Keller, M.D., who diagnosed Briscoe with hypertension.  R. 582–83.

Briscoe was treated as an outpatient at the Harlem Hospital clinic from July 2008 through

December 2009.  R. 443–82, 565–664.  On July 29, 2008, Briscoe visited Harlem Hospital and

requested an excuse from work.  R. 466–68.  Briscoe was referred to see Dr. Nely S. Recano

regarding her obesity and issues with her heart.  R. 467, 579.  Briscoe was reported as having no

anhedonia or depressed mood at the time of her visit.  R. 468, 580.

On August 4, 2008, Briscoe returned to Harlem Hospital requesting an excuse from

work.  See R. 462–65, 574–77.  Briscoe denied experiencing chest pains, fatigue, depressed

mood, nervousness, or sleep disturbance.  R. 462–63, 574–75.  Briscoe was alert, oriented, had

normal affect and did not exhibit a thought disorder.  R. 463, 575.

On August 11, 2008, Dr. Recano evaluated Briscoe at Harlem Hospital.  See R. 459–61.

Briscoe reported that she feared that someone is going to harm her and that she felt pain in her

hip, leg, and ankle.  R. 459.  Briscoe denied having sensory or motor deficits.  Id.  Briscoe

denied anhedonia and depressed mood.  R. 461.  Briscoe was alert, oriented, had normal affect,

and exhibited no signs of thought disorder.  R. 459.  Briscoe was obese, weighing 235 pounds

and having a blood pressure of 147/88, but Dr. Recano noted she was in no acute distress.  Id.

Briscoe saw Dr. Recano again on September 5, 2008.  See R. 456–58.  Briscoe

complained of "on and off" leg pain, which was described as being at a level of zero at the time

of the examination.  R. 456.  Briscoe reported experiencing flashbacks of falling out of window

and having unprovoked fears and anxiety as a result.  Id.  Briscoe was not in acute distress.  Id.

Briscoe was alert, oriented, had normal affect, exhibited no signs of thought disorder, and denied

experiencing anhedonia or depressed mood.  R. 456–57.  Briscoe's extremities did not show any

obvious swelling or tenderness.  Id.  Dr. Recano advised weight reduction, discussed dieting and

exercise with Briscoe, and referred her to a dietitian to deal with her obesity.  R. 457.  Dr.

Recano also referred her to a psychiatrist for PTSD.  R. 457.

Briscoe saw a dietician at Harlem Hospital on February 12, 2009.  See R. 590–91.  The

dietician determined that Briscoe is obese, as she weighed 245 pounds and was five feet, four

inches tall at the time of the examination.  R. 591.  The dietician explained to Briscoe the

complications associated with obesity and prescribed a reducing diet to Briscoe.  Id.

Briscoe was examined by Dr. Recano on September 17, 2009.  R. 605.  Briscoe had not

been adhering to her diet and weighed 252 pounds on the date of the exam.  Id.  Dr. Recano

assessed Briscoe to be alert, oriented, with normal affect and with no evidence of thought

disorder.  R. 606.  Dr. Recano noted Briscoe had a normal back and gait and her extremities did

not have cyanosis, clubbing, or edema.  Id.  Briscoe had hypertension, which was controlled but

could be better.  R. 607.  Briscoe was wheezing mildly, but had no history of asthma.  R.

606–07.  Dr. Recano assessed a PHQ-9 score of 0.  R. 608.

On October 13, 2009, Briscoe saw Dr. Jacquelin Emmanuel, M.D.  R. 603.  Briscoe

reported pain in her left hip and ankle at a level of five on a scale of five to ten.  Id.  Briscoe

limped and was tender on range of motion of the left hip and ankle and on palpation of the left

tronchanteric area.  Id.  Briscoe had good range of motion of the left ankle.  Id.  An x-ray

revealed a healed fracture of the distal left tibia with degenerative joint disorder.  Id.  Dr.

Emmanuel diagnosed post-traumatic arthritis in Briscoe's left ankle and bursitis at the left

femoral fracture, and prescribed Tramadol medication for pain.  Id.

On November 6, 2009, Briscoe visited Harlem Hospital again.  See R. 597–99.  She was

not in any acute distress at the time of the visit.  R. 597.  She was alert, oriented, with normal

effect and had no evidence of a thought disorder.  Id.  She denied having a depressed mood,

nervousness, sleep disturbances, and sensory or motor deficits.  Id.  She had normal tone,

sensation, gait, and motor strength.  R. 598. She was diagnosed with hypertension.  Id.

On December 30, 2009, Briscoe was seen at Harlem Hospital again by Dr. Recano.  See

R. 617–19.  Briscoe was not at the goal with respect to her hypertension, and she was "very

strongly" advised to lose weight.  R. 618.  Plaintiff was assessed with a PHQ-9 score of 0.  R.

619.

d.    Dr. Virginia Contreras

On August 8, 2008, Briscoe began psychiatric treatment with Dr. Virginia Contreras,

M.D.  R. 526.  Dr. Contreras treated Briscoe from August 2008 through February 2012.  See R.

332–34, 483–84, 521–63.  After an evaluation of Briscoe on August 12, 2008, Dr. Contreras

diagnosed Briscoe with PTSD and major depressive disorder.  R. 484, 562.  Briscoe did not have

any suicidal thoughts.  R. 483.  Briscoe's affect was full-ranging and her speech was slightly

pressured.  R. 561.  Dr. Contreras prescribed the medications Ambien and Paxil to Briscoe.  R.

484.  In a report completed in connection with Briscoe's application for public benefits, Dr.

Contreras indicated that Briscoe experienced numbing, nightmares, feelings of doom,

flashbacks, avoidance, depressed mood, decreased energy, decreased concentration, decreased

sleep, and decreased appetite.  R. 422.  Dr. Contreras indicated in the report that Briscoe was

unable to work for at least 12 months.  R. 423.

On September 19, 2008, Briscoe visited Dr. Contreras and reported that she felt

depressed.  R. 484.  She indicated that she was only occasionally taking her prescribed

medications, having taken only five pills total, but that she was getting good results when she

7

took Ambien.  Id.  Dr. Contreras encouraged her to continue to take the medication.  Id.

On October 21, 2008, Briscoe reported that her sister had died, but that she was eating well and sleeping well.  R. 523.  She had been taking her medications daily with good results. Id.

On October 30, 2008, Dr. Contreras completed a report of Briscoe in which she stated that Briscoe has major depression and PTSD.  R. 534.  She evaluated Briscoe's GAF at 55.  Id. Dr. Contreras concluded that the functional impairment that would restrict Briscoe from performing work-related activities was Briscoe's inability to interact with others as evidenced by her depressed mood.  Id.  Dr. Contreras reported that at her most recent exam of Briscoe, she found Briscoe to be depressed, with constricted affect, decreased appetite, and decreased sleep. Id.  She noted that Briscoe had adequate speech and was not homicidal, suicidal, or psychotic. Id.  Dr. Contreras recommended that Briscoe return to work on February 12, 2009.  R. 535.

On November 21, 2008, Briscoe reported that she was feeling well as a result of taking Paxil medication.  R. 539.  On January 26, 2009, Briscoe indicated that she had experienced some grief from the anniversary of her mother's death.  Id.  On March 31, 2009, Briscoe reported that she was taking Paxil and that she felt "paranoid."  R. 540.  On May 26, 2009, Dr. Contreras reported that Briscoe was showing some improvement, but that she was still feeling depressed, had poor sleep, and had nightmares.  Id.

Dr. Contreras reported on June 18, 2009, in a questionnaire completed at the request of plaintiff's counsel, R. 533, that Briscoe suffered from "major depression, recurrent," that her prognosis was guarded, and that Briscoe's current GAF was 50, which was the lowest it had been within the previous year.  R. 526.  Dr. Contreras indicated that she had made the following clinical findings in support of her diagnosis: Briscoe had poor memory, appetite disturbance,

8

sleep disturbance, personality change, mood disturbance, emotional lability, feelings of guilt or

worthlessness, difficulty thinking, and suicidal ideation.  R. 527.  In response to the portion of

the questionnaire that sought Briscoe's "primary symptoms," Dr. Contreras wrote "depression,

anhedonia."  R. 528.  Dr. Contreras checked boxes indicating that Briscoe was "markedly

limited" in every single area of mental functioning listed on the questionnaire. R. 528-31.[4]  Dr.

Contreras reported that Briscoe is capable of tolerating moderate work stress.  R. 532.  Dr.

Contreras expected that Briscoe's impairment would last at least 12 months and estimated that

Briscoe would likely be absent from work more than three times per month.  R. 532–33.  She

noted that Briscoe's impairments would likely produce "good days" and "bad days."  R. 532.

On June 25, 2009, Briscoe reported that she had been having gastrointestinal issues that

were preventing her from taking all of the prescribed medication.  R. 559.  She denied any

"suicidality" and "homicidality."  Id.

On August 5, 2009, Briscoe reported "anniversary grief from being pushed out of a

window."  Id.  Briscoe was taking her medication and achieving better results.  Id.  Briscoe

denied suicidality.  Id.  On August 20, 2009, Dr. Contreras completed another questionnaire for

---

[4] These areas were her abilities to remember locations and work-like procedures; to
understand, remember, and carry out one- or two-step instructions; to understand, remember, and
carry out detailed instructions; to maintain attention for extended periods; to perform activities
within a schedule, maintain regular attendance, and be punctual; to sustain ordinary routine
without supervision; to work in coordination with or proximity to others without being distracted
by them; to make simple work related decisions; to complete a normal workweek without
interruptions from psychologically based symptoms and to perform at a consistent pace without
an unreasonable number and length of rest periods; to interact appropriately with the general
public; to ask simple questions or request assistance; to accept instructions and respond
appropriately to criticism from supervisors; to get along with co-workers or peers without
distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior; to
adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the
work setting; to be aware of normal hazards and take appropriate precautions; to travel to
unfamiliar places or use public transportation; to set realistic goals or make plans independently.

plaintiff's counsel.  R. 542–49.  One noteworthy change was the addition of a PTSD diagnosis and a changed prognosis from "guarded" to "poor."  R. 542.  There was no indication that Briscoe had experienced suicidal ideation, personality change, or sleep disturbance.  R. 543.  The questionnaire reported that Briscoe's primary symptoms were depression and fear.  R. 544.  Briscoe's GAF score remained 50.  R. 542.  Dr. Contreras's opinion as to Briscoe's functional limitations remained the same.  R. 545–47.

On October 7, 2009, Dr. Contreras examined Briscoe and noted that she was "feeling better" and was eating and sleeping adequately.  R. 558.  On December 7, 2009, Dr. Contreras also noted that Briscoe's symptoms of depression had improved but that Briscoe now feels "uneasy," fears "something might happen," and has become paranoid.  R. 558.  On February 24, 2010, Briscoe reported that she was "doing well" with medication.  R. 557.

e.    Dr. Arlene Broska

On October 28, 2008, Dr. Arlene Broska, Ph.D., examined Briscoe on behalf of the SSA.  See R. 487–91.  Dr. Broska reported that Briscoe was able to dress, bathe, and groom herself; cook food four times per week; and clean, do laundry, and shop when her legs are not painful.  R. 489.  She managed her own finances and uses public transportation independently.  Id.  Briscoe could follow and understand simple instructions, perform simple tasks independently, maintain attention and concentration, and learn new tasks.  Id.  She could relate adequately with others, although she may not always deal appropriately with stress.  Id.  Briscoe had full-ranging affect.  Id.  Briscoe's memory was "essentially intact," and her attention and concentration were intact.  Id.  Briscoe denied suicidal ideation.  R. 488.  Dr. Broska concluded that the results of her examination are consistent with psychiatric problems, "but in itself, this does not appear to be significant enough to interfere with [Briscoe's] ability to function on a daily basis."  R. 490.

Dr. Broska diagnosed PTSD, alcohol abuse in partial remission, and cannabis abuse in remission.  Id.  Dr. Broska noted Briscoe's prognosis was "fair with continued involvement in treatment."  Id.

> f.      Dr. Barbara Akresh

Dr. Barbara Akresh, M.D. performed an internal medicine examination of Briscoe on October 28, 2008.  See R. 492–96.  She observed that Briscoe was in no acute distress, had a normal gait and stance, could squat fully, and needed no help changing clothes or getting on or off the table.  R. 493.  She does not use assistive devices, but she climbed stairs using only her right leg and could not walk on toes or heels.  R. 493–94.  Briscoe had intact finger dexterity and grip and full range of motion of the hips, knees, ankles, shoulders, elbows, forearms, and wrists.  R. 494–95.  Dr. Akresh diagnosed Briscoe with hypertension, obesity, status post fracture of left femur and left ankle, status post surgery of left lower extremity, a history of abnormal EKG, and a history of PTSD.  R. 495.  She concluded that Briscoe has "mild limitations in her ability to lift and carry very heavy objects," but indicated her prognosis was "good."  Id.

> g.      Dr. T. Inman-Dundon

On November 6, 2008, state agency psychologist Dr. T. Inman-Dundon reviewed Briscoe's medical records and assessed her condition.  See R. 497–514.  Dr. Inman-Dundon concluded that Briscoe's psychological condition mildly restricts her activities of daily living, creates mild difficulties in maintaining social functioning, and imposes moderate difficulties in her ability to maintain concentration, persistence, or pace.  R. 507.  Dr. Inman-Dundon also conducted a functional capacity assessment of Briscoe from the records and concluded that Briscoe had moderate limitations in six functional areas and no significant limitations in 14 areas.  R. 511–12.

2.    Non-Medical Evidence

Briscoe completed a questionnaire for the New York State Office of Temporary and Disability Assistance on October 24, 2008.  See R. 251–58.  She stated she was a floor salesperson at Home Depot from March 2003 to July 6, 2008.  R. 261.  Briscoe lived with and cared for three children during the relevant period, aged fourteen, thirteen, and eleven, as of October 24, 2008.  R. 251.  Her social activities include speaking on the phone with her family members, which she does "almost always."  R. 256.  She attended church services every Sunday when feeling well.  R. 256.  Briscoe stated that she could walk about 20 to 30 minutes, at which point she would have to stop and rest for about ten minutes.  R. 257.  Briscoe reported that she could follow spoken and written instructions, but she noted that she can become distracted easily.  Id.

Briscoe testified before the ALJ on March 24, 2010.  See R. 45–68.  Briscoe explained that her position at Home Depot required her to lift paint cans, stock shelves, and mix paint.  R. 49.  She lifted up to five gallons of paint at a time.  R. 50.  The job required her to interact with customers.  R. 49.  She spent most of the day walking.  R. 50.  Prior to working at Home Depot, Briscoe was a receptionist at H&R Block for five years.  R. 50.

She testified that she had stopped working because she was told that she had had a heart attack, and her employer would not let her return to work without medical clearance.  R. 51.  Briscoe testified that she has flashbacks about getting pushed out of a window, is depressed, is paranoid that something is going to happen to her, and has panic attacks and nightmares.  R. 52–53.  When she is awoken by a nightmare, she cannot go back to sleep unless she takes Ambien.  R. 53.  She has nightmares three times per week.  Id.  She has panic attacks less than once per month.  R. 54.  She is paranoid of "everything."  R. 55.  Briscoe testified that she has

difficulty concentrating because she "think[s] about everything.  I just be – my mind just never stop thinking [sic]."  R. 60.  Briscoe does not watch movies anymore because she has lost interest in them.  Id.  When asked if she has lost interest in other things, Briscoe responded, "I don't do nothing.  I just lost interest, period.  The only thing I do is take care of my kids."  R. 61.  Briscoe stated that she used to enjoy swimming and riding a bicycle.  Id.

Briscoe lives on the fourth floor of an apartment building that lacks an elevator.  R. 56.  It takes her ten to fifteen minutes to walk up the stairs to her apartment from the ground floor.  Id.  A rod inserted to repair the fracture in her left leg causes her pain when she sits.  R. 56–57.  Briscoe "like[s] to take the bus, but to sit and kind of – it's painful."  R. 60.  On the subway ride to the hearing, she could only sit for twenty minutes before feeling pain in her leg and needing to walk around to alleviate the pain.  R. 57.  Briscoe testified that she can only walk about two blocks.  R. 57.  She said she can lift no more than a bottle of shampoo, though in 2008, during an examination at F.E.G.S., she could lift five to ten pounds.  R. 62.  She can sit down and watch a 30-minute television show if she is lying down.  R. 60.  She does not take pain medication regularly.  R. 61.  Her orthopedist had given her a prescription for pain medication, but she does not take the medication anymore because she received a 30-day supply.  R. 61.  Briscoe used a cane to walk at the time of her testimony before the ALJ and for at least five or six months prior to testifying.  R. 56.  Briscoe limps when she does not use a cane.  Id.  Briscoe began feeling tingling in her fingers and toes "a couple of months" prior to the ALJ hearing.  R. 58.  Briscoe stated that her doctor believes she may be developing carpel tunnel syndrome.  Id.

George Sterross, a vocational expert, also testified at the ALJ hearing.  See R. 63–67.  He categorized Briscoe's position at the Home Depot as "light exertional, semiskilled."  R. 63.  Sterros responded in the negative to the following question posed by the ALJ:

> Let's assume a hypothetical individual the claimant's age, education, past work experience[. A]ssume further that this individual can lift and carry up to 10 pounds occasionally, can stand and walk two hours in an eight hour work day, . . . would need the option to alternate between sitting and standing about ever[y] 15 to 30 minutes, avoid climbing, avoid kneeling, crawling, crouching, and squatting, but could perform other posture movements such as stooping occasionally.  The individual is limited to simple routine low stress tasks involving limited contact with coworkers, supervisors, and the general public.  Can such an individual perform the claimant's past work?

R. 64.  Sterross testified that such an individual could perform work "at the sedentary exertional level," such as an assembler or a mail sorter.  R. 65.  Sterross testified that if Briscoe were unable to perform simple, routine, low-stress tasks she would be unable to perform either a sorting or assembly job.  Id.  Likewise, if Briscoe were "limited to only occasional handling and fingering with the bilateral hands," she would be unable to perform either an assembly or sorting job.  R. 66.

### 3.    Evidence Submitted to the Appeals Council

Following the ALJ's decision, psychiatrist Dr. Azariah Eshkenazi, M.D., examined Briscoe on June 15, 2010.  See R. 9–19.  Briscoe was oriented as to time, place, and person.  R. 10.  Briscoe had a general appearance of depression, clear and coherent speech, productive thought processes, anxious and depressed mood, and appropriate affect.  Id.  Briscoe exhibited no evidence of symptoms of psychosis and denied suicidal ideation.  Id.  Dr. Eshkenazi diagnosed Briscoe with major depression and generalized anxiety and severe physical problems of her left leg.  Id.  He opined that Briscoe is unable to be gainfully employed.  R. 11.  He assessed a GAF score of 50.  R. 12.  Dr. Eshkenazi concluded that Briscoe has marked limitations in ten functional areas,[5] moderate limitations in five functional areas,[6] and mild

---

[5] These are Briscoe's ability to carry out detailed instructions; to maintain concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be

14

limitations in five functional areas.[7]  R. 15–17.  Dr. Eshkenazi determined that Briscoe is capable

of handling low workplace stress and that her condition would continue for twelve months.  R.

18.

      4.    <u>ALJ Decision</u>

On April 9, 2010, the ALJ issued an opinion denying Briscoe's request for disability

insurance benefits and supplemental security income.  <u>See</u> R. 28–39.  His findings of fact and

conclusions of law are as follows:

> 1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

> 2.  The claimant has not engaged in substantial gainful activity since July 6, 2008 . . . .

> 3.  The claimant has the following severe impairments: affective disorder; posttraumatic stress disorder (PTSD); obesity; and residuals of status post fracture left femur and ankle . . . .

> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). . . .

---

punctual; to sustain an ordinary routine without supervision; to work in coordination with or proximity to others without being distracted by them; to complete a normal workweek without psychological interruptions; to interact appropriately with the general public; to respond appropriately to changes in work setting; to travel to unfamiliar places or use public transportation; and to set realistic goals or make plans independently.  R. 15–17.

   [6]  These are Briscoe's ability to understand and remember detailed instructions; to carry out simple instructions; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers; and to be aware of normal hazards and take appropriate precautions.  R. 15–17.

   [7]  These are Briscoe's ability to remember locations and work-like procedures; to understand and remember simple instructions; to make simple work-related decisions; to ask simple questions or request assistance; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  R. 15–16.

[5.  T]he claimant has the residual functional capacity to perform less than a full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).  The claimant can lift/carry/push/pull up to 10 pounds occasionally.  She can stand/walk about two hours and sit six hours within an eight-hour workday but needs the option to sit/stand about every 15-30 minutes.  Also, she has to avoid climbing, kneeling, crawling, crouching and squatting, but can perform other postural movements such as stooping on an occasional basis.  In addition, the claimant is limited to simple, routine low stress tasks involving limited contact with co-workers, supervisors and the general public. . . .

6.  The claimant is unable to perform any past relevant work. . . .

7.  The claimant was born on July 27, 1964 and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563 and 416.963).

8.  The claimant has a limited education and is able to communicate in English . . . .

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. . . .

11.  The claimant has not been under a disability, as defined in the Social Security Act, from July 6, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

R. 30–39.  With regard to the ALJ's fourth finding, the ALJ determined that Briscoe's mental impairments did not satisfy the requirements for anxiety-related disorders or affective disorders under 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. 31–32.  Specifically, he found that her impairments did not markedly restrict her social functioning, activities of daily living, or ability to maintain concentration, persistence, or pace.  Id.; see also Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ noted that Briscoe had not suffered any episodes of decompensation for an extended duration.  R. 32.

16

As to the ALJ's fifth finding, the ALJ's conclusions were based in part on a determination that Briscoe's testimonial "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." R. 34.  The ALJ found that many of Briscoe's testimonial statements to this end were inconsistent with or contradicted by statements Briscoe made elsewhere.  R. 34.  The ALJ also accorded "little weight" to certain opinions of Dr. Contreras that were "not supported by findings on mental status examination and the progress notes."  R. 37.  The ALJ also noted that "Dr. Contreras['s] assessment that the claimant has a GAF of 50 and marked limitations are inconsistent with Dr. Contreras' own assessment that the claimant's GAF was 55 at Exhibit 13F."  Id.  The ALJ accorded greater weight to the opinions of consultative examiners and the state agency psychologist because their opinions are "supported by the objective medical evidence, including findings on physical and mental status examination, and are consistent with the claimant's good activities of daily living."  Id.

As to the ALJ's tenth finding, the ALJ explained that he based his finding on the vocational expert's testimony that Briscoe could, assuming she had certain characteristics posited by the ALJ, perform the requirements of occupations "such as various assembler positions such as Dictionary of Occupational Titles (DOT) code number 713.687-018, of which there are 400,000 jobs in the United States; and various sorter positions such as DOT code number 209.587-010, sedentary exertional level and unskilled, with 60,000 jobs nationally and 800 regionally."  R. 38.  The ALJ observed that "the vocational expert's testimony is inconsistent with the information contained in the DOT," but noted that the vocational expert offered a "reasonable explanation for the discrepancy" in that "the DOT does not address a sit/stand option but that its incorporation is based on his professional experience."  Id.  The ALJ

17

concluded that Briscoe is capable of making certain adjustments to be able to perform "work that exists in significant numbers in the national economy."  R. 39.

Briscoe appealed the ALJ's ruling, but the Appeals Council denied her request for review of the ALJ's decision.  R. 1–6.

II.     SCOPE OF JUDICIAL REVIEW UNDER 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner must determine whether the Commissioner has applied the correct legal standard and whether the decision is supported by substantial evidence.  See, e.g., Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.) (citing Pollard v. Halter, 377 F.3d 183, 188 (2d Cir. 2004)) (additional citation omitted), cert. denied, 551 U.S. 1132 (2007); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127–28; Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted).  Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists."  Johnson v. Astrue, 563 F. Supp. 2d

444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.")).  The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Com'r, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted).  The "substantial evidence" standard means that "once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise."  Brault, 683 F.3d at 448 (citation and some internal punctuation omitted).  "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision."  Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted).

III.     STANDARD GOVERNING EVALUATIONS OF DISABILITY CLAIMS BY THE AGENCY

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037

(2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that

the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. § 404.1520(a)(4); see

also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must

determine whether the claimant is currently engaged in any "substantial gainful activity."  20

C.F.R. § 404.1520(a)(4)(i).  Second, if the claimant is not engaged in substantial gainful activity,

the Commissioner must decide if the claimant has a "severe medically determinable physical or

mental impairment," 20 C.F.R. § 404.1520(a)(4)(ii), which is an impairment or combination of

impairments that "significantly limits [the claimant's] physical or mental ability to do basic work

activities . . . ."  20 C.F.R. § 404.1520(c).  Third, if the claimant's impairment is severe and is

listed in 20 C.F.R. Part 404, Subpt. P, App'x 1, or is equivalent to one of the listed impairments,

the claimant must be found disabled regardless of his age, education, or work experience.  20

C.F.R. § 404.1520(a)(4)(iii).  Fourth, if the claimant's impairment is not listed and is not equal to

one of the listed impairments, the Commissioner must review the claimant's residual functional

capacity to determine if the claimant is able to do work he or she has done in the past, i.e., "past

relevant work."  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant is able to do such work, he or

she is not disabled.  Id.  Finally, if the claimant is unable to perform past relevant work, the

Commissioner must decide if the claimant's residual functional capacity permits the claimant to

do other work.  20 C.F.R. § 404.1520(a)(4)(v).  If the claimant cannot perform other work, he or

she will be deemed disabled.  Id.  The claimant bears the burden of proof on all steps except the

final one – that is, proving that there is other work the claimant can perform.  See Poupore v.

Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

IV.     ANALYSIS

Briscoe seeks reversal of the ALJ's determination on four grounds: (1) that the ALJ

failed to properly apply the "treating physician rule," see Pl. Mem. at 14–18; (2) that Dr.

Contreras's opinions mandate a finding of disability, see id. at 18–19; (3) that the ALJ

improperly evaluated Briscoe's residual functional capacity, see id. at 19–21; and (4) that the

ALJ improperly evaluated Briscoe's credibility, see id. at 22–25.   The Court concludes that the

ALJ's decision is not in conformity with the "treating physician rule" but finds Briscoe's other

contentions to be without merit.

A.     Whether the ALJ's Decision Adheres to the Treating Physician Rule

Under the "treating physician rule," an ALJ must accord "a measure of deference" to the

medical opinions of a social security claimant's treating physician.  Halloran v. Barnhart, 362

F.3d 28, 31 (2d Cir. 2004).  The ALJ must give "controlling weight" to a treating physician's

medical opinion as to the nature and severity of a claimant's impairments if the opinion "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R.

§ 404.1527(c)(2); Morales v. Astrue, 2012 WL 414236 (S.D.N.Y. Feb. 9, 2012) (quoting current

20 C.F.R. § 404.1527(c)(2)).  The ALJ need not give controlling weight to the opinions of a

treating physician that are inconsistent with other substantial evidence in the record, Veino v.

Barnhart, 312 F.3d 578, 588 (2d Cir. 2002), including "the opinions of other medical experts,"

Halloran, 362 F.3d at 32, since "[g]enuine conflicts in the medical evidence are for the

Commissioner to resolve," Veino, 312 F.3d at 588; accord Burgess, 537 F.3d at 128.

If the ALJ rejects the opinion of a treating physician, however, the ALJ must "provide

good reasons for the weight [the ALJ] gives to the treating source's opinion."  Halloran, 362

F.3d at 32–33 (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)) (internal quotation marks omitted).  Courts "do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and [should] continue remanding when [they] encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."  Halloran, 362 F.3d at 33; see also Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing Schaal, 134 F.3d at 505) ("Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand.").

Briscoe's treating psychiatrist, Dr. Contreras, opined that Briscoe was markedly limited in all areas of functioning; that Briscoe had a GAF of 50, indicating serious symptoms or serious functional limitations; and that Briscoe would likely be absent from work more than three times per month.  See R. 526, 529–31, 533, 542, 545–47, 549.  The ALJ gave "little weight" to these assessments by Dr. Contreras and gave "greater weight" to the opinions of the consultative examiners and the state agency psychologist.  R. 37.

 The ALJ stated that he gave only little weight to Dr. Contreras's assessments "because they are not supported by findings on mental status examination and the progress notes."  R. 37.  However, Dr. Contreras stated that six positive clinical findings supported her diagnosis: poor memory, appetite disturbance, mood disturbance, emotional lability, feelings of guilt/worthlessness, and difficulty thinking or concentrating.  R. 543.  Dr. Contreras's progress notes include explicit findings as to some, although not all, of these clinical findings.  See, e.g., R. 483 (mood and appetite).  Dr. Contreras noted decreased concentration in at least one other report.  See R. 422.  It is not clear whether the ALJ overlooked the supporting records or whether the ALJ had some other reasons for discounting Dr. Contreras's opinion.  In either case, because

Dr. Contreras's opinions are in fact supported at least in part by findings from mental status examinations, the ALJ has not provided an adequate explanation for his decision to give little weight to Dr. Contreras's opinions.

Additionally, the ALJ noted that:

> Dr. Contreras['] own assessment that the claimant has a GAF of 50 and marked limitations is inconsistent with Dr. Contreras' own assessment that the claimant's GAF was 55 at Exhibit 13F.  Dr. Contreras' assessment that the claimant has a GAF of 55 is supported by progress notes, at Exhibit 16F, which show that the claimant had no history of suicide attempts, no psychiatric admissions, had an affect that was full range, got good results from Ambien and slept well.

R. 37.  Briscoe interprets the ALJ's statement as meaning that the ALJ believed an inconsistency existed between the two assessments by virtue of the fact that Dr. Contreras assessed Briscoe to have a GAF of 55 on one date and a GAF of 50 on another.  Pl. Mem. at 15.  But Briscoe contends without contradiction that a person's GAF can change over time, id., so this fact alone does not reflect an inconsistency in Dr. Contreras's opinions.

The Government argues that the ALJ was actually pointing out an inaccuracy in the doctor's statement that Briscoe's highest GAF within the past year was 50, when, in fact, Dr. Contreras had assessed Briscoe to have a GAF of 55 ten months prior.  See Reply at 3.  The Court acknowledges that the August 20, 2009 questionnaire that Dr. Contreras completed contains the inaccuracy to which the Government refers.  Compare R. 542 (stating on August 20, 2009 that Briscoe's highest GAF within past year was 50), with R. 534 (assessment by Dr. Contreras on October 30, 2008 that Briscoe's GAF was 55).  However, the Court views the ALJ's statement as noting a perceived inconsistency between the GAF evaluation of 50 that the doctor was then rendering and the prior evaluation of 55.  In other words, the inconsistency the ALJ perceived related to the fact that Briscoe's then-current GAF was 50, not to the fact that it

was at some point higher than that.  The ALJ did not mention the inaccuracy the Government points to.

In other words, the Court reads the ALJ's statement to mean that the ALJ believed that having a GAF of 50 on one date and 55 on another date is not possible or is otherwise inconsistent.  Because the plaintiff's contention that a person's GAF may change on a daily basis, Pl. Mem. at 16, has not been contradicted by the Government, the Court will accept it. Therefore, insofar as the ALJ relied on this perceived inconsistency as a basis for giving little weight to Dr. Contreras's opinion, this would reflect that the ALJ has not proffered an acceptable basis for discrediting Dr. Contreras's findings.

Because the "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell, 177 F.3d at 133, this case must be remanded for that purpose.  The ALJ is also free to obtain any other evidence that will assist him or her in evaluating this question.

      B.     <u>Whether Dr. Contreras's Opinions Necessitate a Finding of Disability</u>

Briscoe argues that the ALJ erred in not finding Briscoe disabled because Dr. Contreras has rendered opinions sufficient to support a finding of disability.  See Pl. Mem. at 18–19.  The fact that Dr. Contreras's opinions may offer a sufficient basis for a finding of disability does not mean that the existence of such evidence requires the ALJ to credit it and follow Dr. Contreras's conclusions.  If substantial evidence in the record supports a contrary finding, and if the ALJ propounds a "good reason" for discrediting Dr. Contreras's conclusions, the ALJ need not find Briscoe disabled.  While Dr. Contreras's opinions standing alone might permit the ALJ to find Briscoe disabled, they do not require such a finding if substantial evidence exists to support a

contrary finding.  <u>Johnson</u>, 563 F. Supp. 2d  at 454.  Accordingly, Briscoe's argument on this

score is rejected.

      C.      <u>The ALJ's Evaluation of Briscoe's Residual Functional Capacity</u>

 Briscoe argues that the ALJ improperly evaluated Briscoe's residual functional capacity

("RFC") because the ALJ did not address the effects of certain non-exertional limitations

identified by Dr. Contreras and Dr. Kirschtein in evaluating Briscoe's RFC.  <u>See</u> Pl. Mem. at

20–21.  The ALJ determined that Briscoe's non-exertional workplace limitations are her need to

be in a work environment in which she is "limited to simple, routine low stress tasks involving

limited contact with co-workers, supervisors and the general public."  R. 33.  Briscoe does not

dispute that this finding is supported by substantial evidence.  Rather, she argues that the ALJ

should have incorporated the more restrictive limitations identified by Dr. Contreras, Dr.

Kirschtein, and Dr. Eshkenazi into the hypothetical question posed to the vocational expert.  <u>See</u>

Pl. Mem. at 20–21.

      As discussed above, the ALJ need not credit the opinions of Briscoe's treating physician,

Dr. Contreras, if the ALJ provides a "good reason" for disregarding her opinions.  Therefore, if

on remand the ALJ sets forth such a basis, the ALJ is not obligated to incorporate the

conclusions of Dr. Contreras into the RFC analysis.

      The ALJ also did not err by not addressing Dr. Eshkenazi's conclusions in his RFC

analysis.  Dr. Eshkenazi had not examined Briscoe as of April 9, 2010, when the ALJ issued his

opinion.  Dr. Eshkenazi examined Briscoe on June 15, 2010.  R. 9–19.  Therefore, it was not

possible for the ALJ to have incorporated Dr. Eshkenazi's evaluation into his opinion.

Obviously, the ALJ should consider Dr. Eshkenazi's conclusions following remand.

Briscoe also objects that the ALJ opinion did not reference Dr. Kirschtein's conclusion on December 8, 2006, that Briscoe had poor concentration.  See R. 402.  This evaluation was not necessarily material because it predates the alleged disability onset date, July 6, 2008, by more than 18 months.  See Folio v. Astrue, 2008 WL 3982972, at *6 (D. Ariz. Aug. 20, 2008) (medical evidence that predates disability onset period is ordinarily not relevant to evaluating claimant's disability); cf. Hickson v. Astrue, 2011 WL 1099484, at *1 (E.D.N.Y. Mar. 22, 2011) (evidence submitted after ALJ decision is immaterial and may be disregarded unless it relates to the relevant time period).  Therefore, the ALJ did not err by not factoring Dr. Kirschtein's December 2006 evaluation into his assessment.  Nonetheless, since the case is being remanded anyway, the ALJ should make clear the relevance of this evidence to his decision.

D.     The ALJ's Reliance on Opinion Testimony of a Vocational Expert

Briscoe also argues that the ALJ improperly considered the testimony of a vocational expert, George Sterross.  See Pl. Mem. at 20.  The ALJ had asked Sterross for his opinion as to whether a hypothetical person with certain physical and non-exertional limitations could obtain gainful employment in the national economy and, if so, in what occupations.  Specifically, the ALJ asked Sterross to opine on the employment options for a person whose non-exertional limitations include being "limited to simple routine low stress tasks involving limited contact with coworkers, supervisors, and the general public."  R. 64.  These are the very non-exertional limitations that the ALJ concluded that Briscoe possesses.  R. 33.  Nevertheless, Briscoe objects that the hypothetical posed to Sterross "failed to consider the other non-exertional restrictions listed by Dr. Contreras."  Pl. Mem. at 20.  However, the ALJ may rely on the testimony of a vocational expert as to the occupational opportunities of a hypothetical person with certain limitations as long as the limitations of the hypothetical person are at least as restrictive as those

26

of the claimant.  See Priel v. Astrue, 453 F. App'x 84, 87–88 (2d Cir. 2011); Salmini v. Comm'r

of Soc. Sec., 371 F. App'x 109, 114 (2d Cir. 2010); VanValkenburg v. Astrue, 2010 WL 455489,

at *1 (W.D.N.Y. Feb. 4, 2010).  If a sufficient basis exists for the ALJ to discredit Dr.

Contreras's opinion, the ALJ would not be obligated to find that Briscoe has all the limitations

that Dr. Contreras stated, and the ALJ could therefore give weight to Sterross's answer to the

ALJ's hypothetical question, which did not assume Briscoe had those limitations.

　　　　Briscoe also argues it was an error for the ALJ to give weight to the vocational expert's

testimony because Sterross testified that a person with the posited limitations could serve as an

assembler in the optical industry, but provided an incorrect citation to that occupation's listing

within the Dictionary of Occupational Titles ("DOT").  See Pl. Mem. at 20; R. 64–65.  Sterross

stated that the occupation is listed under DOT code number 403.687-018, R. 65, when in fact the

code number is 713.687-018, R. 38.  Absent a showing of prejudice, an inaccurate citation by a

vocational expert to the DOT does not constitute a basis in itself for invalidating otherwise valid

testimony.  See Williams v. Astrue, 2012 WL 1113393, at *3 (W.D.N.Y. Mar. 30, 2012)

(testimony of vocational expert not rendered unreliable or otherwise invalidated because the

expert's testimony included a reference to the wrong occupational code number in the DOT).

Because Briscoe does not explain how Sterross's citation to the wrong provision of the DOT has

prejudiced her in any way, the Court finds this objection to be without merit.

　　　　Briscoe further argues that it was improper for the ALJ to rely on Sterross's testimony

because Sterross's testimony "is inconsistent with the information contained in the DOT."  Pl.

Mem. at 20; see also R. 38.  However, Sterross testified that his opinion is in fact consistent with

the DOT.  See R. 65.  In response to the ALJ's question, "Is your testimony consistent with the

information contained in the Dictionary of Occupational Titles?," Sterros replied, "Yes, I'll

27

make a note that we were discussing a sit stand option that is not addressed by the <u>DOT</u>[.] [M]y opinion derives from knowledge and experience observing these jobs as they're currently performed." <u>Id.</u> While Briscoe characterizes the testimony as inconsistent with the <u>DOT</u>, <u>see</u> Pl. Mem. at 20, the mere fact that the <u>DOT</u> lacks information regarding the occupations in which a person has the option to switch from a seated to a standing position and vice versa every 15 to 30 minutes does not render Sterross's testimony inconsistent.  As Sterross testified, certain occupations listed in the <u>DOT</u> could accommodate a person with alternating sitting and standing needs.  Such testimony thus supplements the information contained in the <u>DOT</u>.  Moreover, it is acceptable for the ALJ to credit testimony from a vocational expert, which is based on the expert's knowledge and experience from observing how such occupations are performed.  <u>See</u> 20 C.F.R. § 404.1560(b)(2).

  E. <u>Briscoe's Credibility</u>

  Briscoe argues that the ALJ erred in finding that she was not credible.  Pl. Mem. at 22–25.  The Second Circuit has held that where an ALJ rejects witness testimony as not credible, the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record."  <u>Williams v. Bowen</u>, 859 F.2d 255, 260–61 (2d Cir. 1988) (citing <u>Carroll v. Sec'y of Health and Human Servs.</u>, 705 F.2d 638, 643 (2d Cir. 1983)); <u>accord</u> <u>Snell</u>, 177 F.3d at 135.  The ALJ must make this determination "in light of the medical findings and other evidence regarding the true extent of the pain alleged by the claimant."  <u>Mimms v. Heckler</u>, 750 F.2d 180, 186 (2d Cir. 1984).  The Social Security Administration ("SSA") has issued a regulation relating to reports of pain or other symptoms by a claimant for SSI benefits.  <u>See</u> 20 C.F.R. § 416.929(c).  This regulation provides, <u>inter</u> <u>alia</u>, that the SSA "will not reject [a claimant's] statements about the intensity and persistence of [her] pain or other symptoms or

about the effect [her] symptoms have on [her] ability to work . . . solely because the available objective medical evidence does not substantiate [her] statements." 20 CFR § 416.929(c)(2). The regulations also provide that the SSA "will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [her] statements and the rest of the evidence." 20 C.F.R. § 416.929(c)(4).[8]

The ALJ found Briscoe's testimony not credible to the extent it was inconsistent with the conclusions the ALJ reached as to Briscoe's RFC.  R. 34.  The ALJ cited five inconsistencies that underlay his credibility finding: (1) Briscoe testified that she could only sit for 20 minutes

---

[8] The Social Security ruling cited by plaintiff, SSR 96-7p, largely repeats the requirements contained in the regulations.  The ruling states:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).  Additionally, the ALJ should examine the claimant's internal consistency and may consider personal observations as long as they are part of a larger overall evaluation.  SSR 96-7p, 1996 WL 374186, at *5, 8.

and had to watch a 30-minute television show lying down, but had previously stated that she could sit for up to one hour; (2) Briscoe testified that she could not concentrate, although she can manage her finances and take medication without needing assistance; (3) Briscoe testified that she does not clean, but had previously reported that she spent the entire day performing chores, including cleaning her home; (4) Briscoe testified that she stopped working because she had a heart attack and had not received clearance to return to work from Dr. Contreras, but there is no evidence in the record that Briscoe ever suffered a heart attack and Dr. Contreras is a psychiatrist, not a cardiologist; and (5) Briscoe testified that she sleeps throughout the day every day, but had previously stated that she watches television, cooks, and cleans throughout the day. Id.

Briscoe contends that the ALJ erred because he assessed Briscoe's RFC before he determined her credibility. Pl. Mem. at 23; see, e.g., Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) ("before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility") (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001)); see also SSR 96-7p, 1996 WL 374186, at *3 ("Once the adjudicator has . . . ma[de] a finding on the credibility of the [claimant's] statements, the impact of the symptoms on the [claimant's] ability to function must be considered along with the objective medical and other evidence . . . ."). This argument lacks merit. The ALJ stated that he reached his conclusion as to Briscoe's RFC "[a]fter careful consideration of the entire record," R. 33 (emphases added), which included Briscoe's testimony. See also id. ("In making [the RFC] finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ."). The basis of Briscoe's argument that the ALJ evaluated Briscoe's credibility after assessing Briscoe's RFC is the ALJ's statement that

he found Briscoe's testimony regarding the intensity, persistence, and limiting effects of Briscoe's symptoms to be incredible "to the extent they are inconsistent with the above residual functional capacity assessment." R. 34. Read in context, however, this statement does not indicate that the RFC assessment was a basis for a finding of lack of credibility. Instead, the ALJ's decision discusses in detail the aspects of Briscoe's testimony that were contradicted by other evidence in the record, and explains which aspects of Briscoe's testimony he found credible. See R. 33–34. Only after this analysis does the ALJ assess the remaining evidence relevant to Briscoe's RFC. See R. 34–35. It is thus clear that the ALJ assessed Briscoe's credibility before determining her RFC.

Next, Briscoe argues that the ALJ's reliance on statements by Briscoe contained in a document titled "Disability Report Adult," see R. 259–66, is misplaced for multiple reasons. Pl. Mem. at 23. According to the Disability Report Adult, Briscoe stated that she could sit for up to an hour at a time. R. 260. The ALJ noted that this statement is inconsistent with Briscoe's testimony that she could only sit for 20 minutes at a time and had to watch a 30-minute television show lying down. R. 57, 60. Briscoe first contends that the document is undated and, therefore, does not provide sufficient context for Briscoe's statements. Pl. Mem. at 23. The document states, however, that it is an "Internet medical form initiated on: 09/25/2008." R. 266. The document also reports that the date of Briscoe's most recent visit with Harlem Hospital was September 25, 2008, R. 263, and that Briscoe's "next appointment" with Dr. Contreras was October 17, 2008, R. 262. Accepting these dates as accurate, the form could not have been completed after October 17, 2008. The period September 25 through October 17, 2008, is within the relevant disability period of this action. The form's dating provides sufficient context for the statements contained therein.

31

Briscoe next argues that the above inconsistency in her statements regarding the duration of her ability to sit merely "reflects the continued deterioration of her health" and is therefore not an inconsistency at all.  Pl. Mem. at 23.  Such statements would be consistent with deteriorated health.  They are also consistent with fabricating or embellishing testimony to the ALJ.  Briscoe provides no citation to record evidence demonstrating that the condition in her leg had in fact worsened between September 2008 and March 2010 as she suggests.  In any event, Briscoe testified before the ALJ that the pain in her legs remained essentially unchanged between September 2008 and March 2010.  See R. 58.

Briscoe argues further that even if she could in fact sit for one hour, the inability to sit for either 20 minutes or one hour "renders her incapable of working in any capacity."  Pl. Mem. at 23.  However, this argument is belied by the vocational expert's testimony, which the ALJ credited, that occupations such as assemblers and sorters exist in substantial numbers in the national economy that would permit Briscoe to alternate between sitting and standing every 15 to 30 minutes.  See R. 64–65.

Briscoe contends that the ALJ erred in relying on statements that she watches television, reads, cooks, performs household chores, and can manage her own finances and remember to take her medications without the assistance of others.  Briscoe objects that these statements are not "inconsistent with a claim of disability as the ALJ alleges[, because] '[a] claimant need not be an invalid in order to be found disabled under the Social Security Act.'"  Pl. Mem. at 23–24 (quoting Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998)).  Briscoe mischaracterizes the ALJ's reasoning.  The ALJ cited these statements to show inconsistencies in her testimony.  See R. 34 ("Part of the claimant's testimony is at odds with the other evidence or [sic] record.").  The

ALJ did not rely on the statements to show that such acts were incompatible with a claim of disability.

Briscoe argues that the ALJ erred by failing to take into account Briscoe's prior work history. Pl. Mem. at 24–25; see generally Sheldon v. Comm'r of Soc. Sec., 2009 WL 5216957, at *6 (N.D.N.Y. Dec. 30, 2009) ("In addition to the seven factors noted above, an ALJ is required to take into account a claimant's work history because, '[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.'") (quoting Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983)). However, in the section in which the ALJ assessed Briscoe's credibility, he devoted an entire paragraph to Briscoe's employment history. See R. 33. This is sufficient to show that the ALJ considered Briscoe's prior work history.

Finally, Briscoe argues that it was improper for the ALJ to conclude that Briscoe's testimony regarding her ability to sit and clean and the amount of time she spends sleeping during the day was inconsistent with prior statements. See Pl. Mem. at 24. Briscoe notes that the inconsistent prior statements the ALJ cited were prepared from May 30, 2008, through July 11, 2008, nearly two years before the ALJ hearing. Briscoe argues that her testimony may be accurate notwithstanding the prior statements if her condition had worsened since she made the apparently inconsistent prior statements. Id. But Briscoe cites to no record evidence showing that her condition in fact worsened. Briscoe argues that the ALJ's duty to develop the record required him to inquire into whether her condition had worsened to determine precisely whether her testimony to the ALJ was in fact inconsistent with previous statements to medical care professionals. Id. However, the ALJ did ask Briscoe whether her having gained approximately 35 to 45 pounds since 2008 affected her pain. R. 58. Briscoe testified, "In my back it did, I think something's wrong with my back but as far as my leg, the leg stay hurting all the time."

Id. The ALJ could reasonably interpret that statement to mean that the pain in her leg had remained roughly constant since 2008 and that the condition of her leg had therefore not worsened since 2008.

V.    CONCLUSION

The Commissioner's motion for judgment on the pleadings (Docket # 9) is denied. Briscoe's motion for judgment on the pleadings (Docket # 12) is granted in part and denied in part. The case is remanded to the SSA for further proceedings consistent with this Opinion and Order. The Clerk is requested to enter judgment.

Dated: September 25, 2012
       New York, New York

                                    _____
                                    GABRIEL W. GORENSTEIN
                                    United States Magistrate Judge

34